Gina E. Carrillo #030579
**GAMMAGE & BURNHAM, P.L.C.**
40 North Central Avenue
20th Floor
Phoenix, AZ 85004
T: 602.256.0566
F: 602.256.4475
gcarrillo@gblaw.com
docket@gblaw.com
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Natalie Shpiegel, an individual<br><br>Plaintiff,<br><br>vs.<br><br>Carvana LLC, an Arizona Limited Liability Company,<br><br>Defendant. | Case No. CaseNumber<br><br>**COMPLAINT** |

Pursuant to Federal Rule of Civil Procedure 8, Plaintiff Natalie Shpiegel files this Complaint and alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff Natalie Shpiegel is an Arizona citizen who resides in Maricopa County.

2. At all times relevant to the Complaint, Defendant Carvana LLC (Carvana) has continuously been a limited liability company doing business in the state of Arizona.

3. At all relevant times, Carvana has continuously been an employer within the meaning of Section 701(b) of Title VII, 42 U.S.C. § 2000e(b).

4. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court of Arizona.

5. This Court has jurisdiction over this matter under 28 U.S.C. § 451, 1331,

1337, and 1343.

6. Venue is proper in this court because the acts giving rise to Ms. Shpiegel's claims occurred in the District of Arizona.

## GENERAL ALLEGATIONS

7. Carvana is a national car resale company that employs over 500 employees nationwide.

8. Carvana employed Ms. Shpiegel in its headquarters located in Tempe, Arizona beginning in September 2021, as an Associate Director in the Market Operations department.

9. In her role as an Associate Director, Ms. Shpiegel managed her teams to drive "Last-Mile" results.

10. Ms. Shpiegel and her family moved from her home in Seattle, Washington to Arizona, specifically for the role at Carvana.

11. During her job negotiations with Carvana, Ms. Shpiegel was told that equity made up a large part of the compensation package.

12. Based on this information, Ms. Shpiegel accepted a lower cash salary, understanding that she would receive a large portion of her compensation in shares of Carvana.

13. Upon hire, Ms. Shpiegel was granted 732 restricted stock units (RSUs).

14. For this RSU grant, 25% would vest on October 1, 2022, and 2.5% of the remaining RSUs on the first day of each succeeding month.

15. At the time that these RSUs were granted, they were valued at $240,000.

16. Ms. Shpiegel performed her job well, repeatedly receiving positive reviews, additional team members to manage, and additional responsibilities.

17. Carvana Chief Operating Officer, Ben Huston, told Ms. Shpiegel in an email sent on April 14, 2022, "the work you led in Market Ops for T[itle] & R[egistration] was really impressive. I know it's far from over and I'm sure you'll tell me it was a team effort (and it was) but you've clearly emerged as a key leader in the company and just wanted to

let you know it's recognized and appreciated (and awesome)."

18. In June 2022, Ms. Shpiegel's original stock grant was repriced at $50 per stock unit, resulting in a replacement grant of 5,200 RSUs in order to retain the value of her original RSU grant upon hire.

19. The vesting schedule of the original grant changed as a result of the replacement grant.

20. Instead of her original grant beginning to vest in September 2022, it now did not start vesting until June 2023.

21. Ms. Shpiegel's previous manager, Jenni Stanford, had requested that human resources do the customary "360 Assessment" of Ms. Shpiegel in order to promote her in or around August or September 2022.

22. In November 2022, Mr. Huston told Ms. Shpiegel after a Director meeting that her "work was very appreciated and that there were upcoming organizational changes."

23. During the same conversation, Mr. Huston told Ms. Shpiegel that he "valued her as part of the team" and offered her an $80,000 RSU grant, the equivalent of 6,052 shares, and a $15,000 salary raise. This was outside the normal stock grant process.

24. Most other Directors did not receive a stock grant at this time.

25. Ms. Shpiegel was asked not to disclose that she had received a stock grant outside the normal stock grant process.

26. For this RSU grant, 25% would vest on December 1, 2023, and 2.5% of the remaining RSUs on the first day of each succeeding month.

27. With the reorganization in November and December 2022, Ms. Shpiegel's new supervisor became Michell McCroskey, Senior Director.

28. Mr. McCroskey reported to William Adams, Senior Vice President of Fulfillment Operations.

29. In addition, Ms. Shpiegel also supported Jacqueline Hearns, Senior Director, of Market Operations.

30. Prior to December 2022, Senior Leadership continued to discuss promoting

Ms. Shpiegel.

31. In December 2022, the value of the Carvana stock crashed to as low as $4.05 per share.

32. During this time, Carvana told employees that the vesting of RSUs would be delayed by a year, in order to keep the company afloat.

33. In January 2023, Ms. Shpiegel received a positive review with high marks.

34. Because of her positive review, Ms. Shpiegel was awarded an additional $60,000 in RSUs, which was the equivalent of 12,876 shares.

35. For this RSU grant, 25% would vest on January 1, 2024, and 2.5% of the remaining RSUs on the first day of each succeeding month.

36. From January 2023 to June 2023, Ms. Shpiegel's team grew by four people, financial results improved dramatically, and her team was meeting and exceeding their goals.

37. During this period, Ms. Shpiegel maintained a high management score.

38. The high management score was above average at Carvana.

39. On or about June 22, 2023, Ms. Shpiegel had her mid-year review with Mr. McCroskey.

40. The performance review was overwhelmingly positive.

41. In her written performance review, her manager made overall positive remarks, including:

    a. That Ms. Shpiegel had a "[h]igh capacity for understanding complex operational and financial concepts," was a "[g]reat partner for our customers . . ." and was a "[s]ubject matter expert on most things Mops operational, structural and strategic."

    b. "The last 6 months have been a whirlwind for Natalie and she has generally handled a significant amount of change very well and remained positive throughout. As we've 'raised the bar' of expectations . . . Natalie has risen to the occasion time and time again.

GAMMAGE & BURNHAM, PLC
40 N. CENTRAL AVENUE, 20TH FLOOR
PHOENIX, ARIZONA 85004-4527
(602) 256-0566

". . . Natalie has shown a re-engaged level of buy-in and commitment over the last 12 weeks specifically and it's being noticed by not only her manager but her stakeholders as well."

c.  "As we look toward the next 6 months for Natalie, the message is really to 'stay the course' and 'keep doing what you're doing.' Brand and reputation, coupled with high emotional intelligence, are what get her promoted to the Director level at EOY and she is very much on-track!"

42. Ms. Shpiegel discussed her potential promotion with Mr. McCroskey during her mid-year review. Ms. Shpiegel learned that her promotion had been presented to the Senior Leadership, but Carvana as a whole determined that only 1-2% of employees could be promoted at that time.

43. Ms. Shpiegel was told that she was on track to be promoted by the end of the year.

44. On or about July 5, 2023, Ms. Shpiegel learned that she was pregnant.

45. On July 7, 2023, Ms. Shpiegel told Cristina Bruns, Senior Director in Marketplaces, that she was pregnant.

46. On or about July 25, 2023, Ms. Shpiegel and Mr. McCroskey had a 1:1 meeting.

47. During that meeting, Mr. McCroskey shared with Ms. Shpiegel that another Associate Director might leave Carvana, and asked about taking over the Financial Planning and Analysis (FP&A) team, which provided accounting services.

48. Ms. Shpiegel stated that she believed she could take on the additional team, but shared that she had no accounting training so there would be a ramp up period for her.

49. On or about July 26, 2023, Mr. McCroskey called Ms. Shpiegel to tell her that the other Associate Director was leaving Carvana.

50. During this call, Ms. Shpiegel told Mr. McCroskey that she was excited about taking on the new team and the new challenge.

51. On or about July 25, 2023, Ms. Shpiegel and several coworkers went on a business trip to Atlanta.

52. Historically, Ms. Shpiegel and other coworkers would drink a large amount of alcohol on these trips.

53. Upon information and belief, coworkers took notice of the fact that Ms. Shpiegel did not drink alcohol on this trip.

54. During the business trip to Atlanta, coworkers offered Ms. Shpiegel alcohol which she turned down.

55. During the business trip to Atlanta, Ms. Shpiegel volunteered to be the designated driver on at least three occasions.

56. During the trip, there was a day where everyone was on a boat and in bathing suits.

57. While she was in her bathing suit, bruises from Ms. Shpiegel's hormone shots were visible on her thighs.

58. As this was not her first pregnancy, Ms. Shpiegel was showing earlier, and it was evident when she was wearing her bathing suit.

59. During the business trip to Atlanta, Ms. Shpiegel shared with Chelsea Davis, Associate Director in Carvana's Human Resources Department, that she was pregnant.

60. Ms. Shpiegel and Ms. Davis discussed their shared IVF and fertility experiences. Ms. Shpiegel also shared that she found it hard not to drink alcohol on the business trip.

61. Ms. Shpiegel shared how far along she was in the pregnancy, and when her 13-week ultrasound would take place, August 18, 2023.

62. Upon the return from the business trip, Ms. Shpiegel started to have meetings with Mr. McCloskey about her new role and team.

63. On or about August 1, 2023, Ms. Shpiegel presented Mr. McCloskey with a proposed organizational chart for the larger team, and discussed ideas she had for a more cross-functional team that support multiple departments.

64. On or about August 4, 2023, Mr. McCloskey sent an email to other Carvana employees to officially announce that Ms. Shpiegel would be taking over the FP&A team. Mr. McCloskey introduced Ms. Shpiegel and said "[she] will no doubt add a ton of new perspectives and valuable experience to an already stellar team."

65. On or about August 7, 2023, Mr. McCloskey had a conversation with Ms. Shpiegel where he reiterated that she was on track for a promotion at the end of the year.

66. During this conversation, they ran into Ellen Williams, a pregnant Vice President, and all three discussed pregnancy related topics.

67. During this conversation, Ms. Shpiegel shared her experience of having two cesarean sections and mentioned that "the next one will be a planned c-section."

68. On the same day, Ms. Shpiegel attended a happy hour and dinner with coworkers, where again, she did not drink alcohol.

69. Ms. Hearns sat next to Ms. Shpiegel at this dinner.

70. On or about August 8, 2023, Ms. Shpiegel and Mr. McCroskey had a one-on-one meeting.

71. During this meeting, Ms. Shpiegel expressed her concerns about losing her scope in her role, as part of her team was being taken away.

72. Specifically, Ms. Shpiegel wanted to clarify whether taking on the new FP&A team would mean that her other teams would be given to other directors in her department.

73. Ms. Shpiegel raised this concern because previously she saw Adam Roderique, Director of Logistics Planning, talking to her team and she was concerned he would be taking them.

74. Mr. McCloskey shared in this concern and recommended to her to continue to advocate for herself not to have her team taken away.

75. Mr. McCloskey also represented that he would advocate for Ms. Shpiegel.

76. During this meeting, Mr. McCloskey asked Ms. Shpiegel how old she was, and recommended to her that she focus on work/life balance and to "take a break from

chasing career progression."

77. On the afternoon of August 8, 2023, Ms. Shpiegel had a meeting with Ms. Hearns and Mr. Roderique.

78. During this meeting, Ms. Shpiegel raised concerns about the reorganization and the impact on Carvana.

79. During this meeting, Ms. Shpiegel became overwhelmed and started to cry.

80. Ms. Shpiegel apologized to Ms. Hearns and Mr. Roderique, stating that her behavior was, "hormonal."

81. From August 9 through August 11, 2023, Ms. Shpiegel worked hard to learn her new role.

82. Ms. Shpiegel scheduled 1:1 meetings with her new reports, and set up six different meet and greets with cross functional leaders.

83. Ms. Shpiegel also met with business partners to learn what was working with the teams and what was not.

84. On or about August 9, 2023 Ms. Shpiegel met again with Ms. Davis. Ms. Shpiegel shared her concerns about how a change in role and reduction in scope, coupled with her pregnancy would negatively impact the likelihood for her to be promoted at the end of the year.

85. On or about August 10, 2023, Ms. Shpiegel told Ms. Hearns that taking on the new team was making her happy.

86. On the same day, Ms. Shpiegel met with Ms. Bruns to discuss the reorganization situation and how to get more support internally.

87. Ms. Bruns and Ms. Shpiegel also discussed Ms. Shpiegel's pregnancy, and what appointments she had upcoming, including her 13-week ultrasound.

88. Ms. Bruns told Ms. Shpiegel that she understood how she was feeling, but that Ms. Shpiegel had something "more important cooking" and that she should focus on her pregnancy.

89. On or about August 14, 2023, Ms. Shpiegel met with William Adams, Vice

President.

90. In this meeting, Ms. Shpiegel expressed her excitement about her new team and her desire to continue to grow her career and stay on track for promotion.

91. Ms. Shpiegel told Mr. Adams that she was concerned about her promotion because she "may have a change in personal circumstances at the end of the year."

92. On or about August 15, 2023, Ms. Shpiegel had a meeting with Mr. McCloskey where she also told him that her personal circumstances would be changing at the end of the year.

93. Carvana terminated Ms. Shpiegel on August 18, 2023.

94. The reasons given for Ms. Shpiegel's termination were false and/or elevated to a standard not applied to others in leadership who were not female nor pregnant.

95. Prior to her termination, Ms. Shpiegel received positive performance feedback.

96. Prior to her termination, Ms. Shpiegel took on new leadership responsibilities and was being considered for promotion.

97. Prior to her termination, Ms. Shpiegel had never been placed on a Performance Improvement Plan.

98. Prior to her termination, Ms. Shpiegel did not receive any negative written feedback.

99. By the end of her employment, Ms. Shpiegel had accumulated 22,634 unvested RSUs, that would continue to vest to this day.

100. 5,902 of Ms. Shpiegel's RSUs were set to vest by her delivery date of February 29, 2024.

101. 7,410 of Ms. Shpiegel's RSUs were set to vest by May 31, 2024.

102. Ms. Shpiegel filed a Charge of Discrimination alleging sex discrimination with the Equal Employment Opportunity Commission (EEOC) on September 12, 2023.

103. Ms. Shpiegel received her Notice of Right to Sue from the EEOC on July 24, 2024.

## COUNT ONE

### Title VII of the Civil Rights Act of 1964 – Sex Discrimination (Pregnancy)

104. The allegations in the foregoing paragraphs are incorporated by reference.

105. Since at least 2023, Carvana has engaged in unlawful employment practices based on sex (pregnancy) in violation of §§ 701(k) and 703(a)(1) of Title VII, 42 U.S.C. §§ 2000e(k) and 2000e-2(a)(1) by terminating Ms. Shpiegel because of her sex (pregnancy).

106. At all relevant times, Ms. Shpiegel was employed by Carvana.

107. At all relevant times, Ms. Shpiegel was qualified to perform her job duties as an Associate Director at Carvana.

108. During her employment with Carvana, Ms. Shpiegel learned that she was pregnant.

109. Carvana terminated Ms. Shpiegel because she was pregnant.

110. After Carvana terminated Ms. Shpiegel, Carvana split her responsibilities among other members of Senior Leadership.

111. The effect of the practices complained of in the foregoing paragraphs has been to deprive Ms. Shpiegel of equal employment opportunities and otherwise adversely affected her employment status because of her sex, female.

112. The unlawful employment practices complained of in the foregoing paragraphs were intentional.

113. The unlawful employment practices complained of in the foregoing paragraphs were done with malice or with reckless indifference to Ms. Shpiegel's federally protected rights.

## JURY TRIAL DEMAND

Ms. Shpiegel demands a jury trial on all claims and issues set forth herein.

## REQUEST FOR RELIEF

Ms. Shpiegel requests a judgment against Carvana as follows:

    a.    for the appropriate backpay, in amounts to be determined at trial,

GAMMAGE & BURNHAM, PLC
40 N. CENTRAL AVENUE, 20TH FLOOR
PHOENIX, ARIZONA 85004-4527
(602) 256-0566

including, but not limited to, lost salary and RSUs, and other affirmative relief necessary to eradicate the effects of unlawful employment practices;

  b. for compensatory damages, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of unlawful employment practices;

  c. for consequential damages, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of unlawful employment practices;

  d. for punitive damages, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of unlawful employment practices;

  e. for reasonable attorneys' fees pursuant to Title VII;

  f. for costs pursuant to Title VII;

  g. for interest on the foregoing amounts at the highest legal rate from the date of Judgment until paid; and

  h. for such other and further relief as is proper and just.

RESPECTFULLY SUBMITTED this 26th day of September, 2024.

            GAMMAGE & BURNHAM, P.L.C.

            By: */s/ Gina E Carrillo*
              Gina E. Carrillo
              40 North Central Avenue
              20th Floor
              Phoenix, AZ 85004
              *Attorneys for Plaintiff*

**GAMMAGE & BURNHAM, PLC**
40 N. CENTRAL AVENUE, 20TH FLOOR
PHOENIX, ARIZONA 85004-4527
(602) 256-0566